**FOREST CONSERVATION COUNCIL; Idaho Sportsmen Coalition; Idaho Wildlife Federation; Howard Buettgenbach, Plaintiffs,**

v.

**Mike ESPY, Secretary of Agriculture; Ronald Brown, Secretary of Commerce; United States Forest Service; National Marine Fisheries Service, Defendants.**

**MOUNTAIN STATES LEGAL FOUNDATION, a nonprofit Colorado corporation on behalf of its members, Jim and Gerry Adkins, Lafe and Emma Cox, and David and Lynnea Imel, Intervenor,**

and

**Boise Cascade Corporation, Defendant–Intervenor, and Cross–Claimant,**

v.

**Ronald BROWN, Secretary of Commerce; and National Marine Fisheries Service, Cross–Defendants.**

Civ. No. 92–0341–S–HLR.

United States District Court, D. Idaho.

Oct. 28, 1993.

Daniel J. Stotter, Eugene, OR, Brian F. McColl, Wilson, Carnahan & McColl, Boise, ID, Gary K. Kahn, Portland, OR, Victor M. Sher, Todd D. True, Katherine S. Poole, Sierra Club Legal Defense Fund, Seattle, WA, D. Bernard Zaleha, J.D., Boise, ID, for plaintiffs.

Maurice O. Ellsworth, U.S. Atty., D. Marc Haws, Asst. U.S. Atty., D. Idaho, Boise, ID, for Federal defendants.

Joanne Herlihy, William Perry Pendley, Mountain States Legal Foundation, Denver, CO, Bruce M. Smith, Rosholt Robertson & Tucker, Boise, ID, for intervenor Mountain States Legal Foundation.

Guy G. Hurlbutt, Tony J. Steenkolk, Boise Cascade Corporation, Boise, ID, for defendant-intervenor/cross-claimant Boise Cascade Corporation.

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT AND DISMISSING ACTION

RYAN, Senior District Judge.

### I. FACTS AND PROCEDURE

Now before the court in the above-entitled matter is the defendants' Motion to Dismiss

Plaintiffs' First Amended Complaint for Lack of Jurisdiction Under the Endangered Species Act, filed on May 28, 1993. Also before the court are plaintiffs' Motion for Summary Judgment and defendants' Motion for Summary Judgment, filed on June 30, 1993, and July 2, 1993, respectively. In addition, Intervenor/Cross–Claimant Boise Cascade Corporation ("Boise Cascade") filed a Motion for Summary Judgment on July 2, 1993. All of these motions have been extensively briefed by the parties and a hearing was held on September 16, 1993. Therefore, these motions are now ripe for decision.

On June 25, 1993, the parties filed a Stipulation of Facts setting forth most of the facts relevant to the court's decision in this matter. The court hereby incorporates the Stipulation of Facts by reference, and the following discussion of the facts relies heavily on that stipulation.

The plaintiffs challenge certain management decisions made by the Payette and Boise National Forests with respect to a road known as the South Fork of the Salmon River Road ("SFSR road" or "the road"). This forest development road [1] runs through portions of the Payette and Boise National Forests in central Idaho. Twenty-eight miles of the road run along the South Fork of the Salmon River through steep, mountainous terrain.

The mountainsides in this area consist of ancient granite and are part of the Idaho batholith. The soil is full of fine sediments and is highly erosive. The road is constructed of native materials by cuts and fills. Annual precipitation in the area averages between 20 and 60 inches, consisting mostly of snow. The road has been a major source of sediments entering the South Fork of the Salmon River as the precipitation washes sediments from the road into the river and its tributaries.

The South Fork of the Salmon River provides critical spawning habitat for Snake River spring/summer chinook salmon and fall chinook salmon. It is well established that granite and other sediments in the river are harmful to the chinook salmon habitat. For example, sediments cover the salmon nests or redds and suffocate the salmon eggs. Sediments also trap emerging fry and limit the habitat of other organisms which are part of the food base of the salmon. The upper SFSR road contributes a significant portion of the management-induced sediment in this area. Eliminating this sediment source represents the single greatest opportunity for improving this critical chinook salmon habitat.

On May 6, 1988, the Regional Forester for the United States Forest Service Intermountain Region approved a Record of Decision (ROD) for the Land and Resource Management Plan ("LRMP") for the Payette National Forest and later approved a ROD for the LRMP of the Boise National Forest on April 27, 1990. These plans included management direction for the respective portions of the SFSR road in these national forests. Both LRMPs were accompanied by a Final Environmental Impact Statement ("FEIS"), prepared pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321, *et seq.*, after public and interagency review. The Forest Service considered several management options for the road, including both closure and paving. At that time, however, there were no funds available for paving the road.

The ROD for both of the LRMPs called for closing some 16 miles of the road and converting it to a trail. In February of 1988, before the road conversion took place, Intervenor Mountain States Legal Foundation filed an action in this court [2] challenging the decision to convert and close the road. The plaintiffs in that action strongly contested their being denied access over the road to their inholdings in and around the town of Yellow Pine, Idaho. In the spring of 1988, the Idaho Legislature sent a resolution to

---

**1.** A forest development road is a road "wholly or partly within or adjacent to and serving a National Forest and other lands administered by the Forest Service which has been included in the forest development transportation plan." 36 C.F.R. § 212.1(d) (1992).

**2.** *See Mountain States Legal Found. v. Espy,* Civil No. 88–1061 (D.Idaho Feb. 16, 1988).

Congress asking that the SFSR road be upgraded and improved both to reduce sediments and to provide access for the residents of Yellow Pine. In June of 1989, Congress appropriated $8 million to the Forest Service budget to pave the SFSR road.

The LRMPs contained authorization for amendment of the plans to respond to changing needs and opportunities, congressional actions, and/or major new management or production technology. After Congress appropriated funds to pave the road, the Payette and Boise National Forests opened the NEPA process and began studying the environmental effects of the proposal to pave the SFSR road. On July 30, 1990, the Forest Service issued an FEIS and ROD on the proposal. The FEIS concluded that paving the road would significantly reduce the amount of sediments flowing into the river and would thereby benefit the chinook salmon and their habitat.

On October 15 and 19, 1990, certain of the plaintiffs in this action filed administrative appeals of the FEIS and ROD on the paving project with the Regional Forester, challenging the decision and the associated deviation from the prior LRMPs. The plaintiffs raised a host of issues on appeal. On January 25, 1991, the Regional Forester issued his decisions denying all issues or claims raised by the plaintiffs.[3] The Regional Forester stated in his opening remarks to the plaintiffs that the decisions of the forest supervisors were affirmed on all points except those dealing with the cumulative effects of sediment on anadromous fish habitat. However, a careful review of the decisions reveals that the Regional Forester concluded that the FEIS and ROD did in fact address adequately all of the specific concerns raised by the plaintiffs regarding cumulative impacts.

The Regional Forester noted that the status of the chinook salmon had changed because the species had been identified as a "sensitive species" in August of 1990 by Region 4 of the Forest Service, and because the species was being proposed for listing as a threatened species under the Endangered Species Act. In an apparent attempt to ac-commodate the concerns of the plaintiffs, and in order to ensure protection of the salmon, the Regional Forester asked the Payette and Boise National Forests to prepare a Biological Evaluation ("BE") under the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600, et seq., addressing the short term construction impacts and the long term cumulative impacts of the project on the chinook salmon.

NFMA directs the Forest Service to promulgate regulations specifying guidelines for land management plans which provide for a diversity of plant and animal populations. 16 U.S.C. § 1604(g)(3)(B). Accordingly, Forest Service regulations require that "[f]ish and wildlife habitat shall be managed to maintain viable populations of existing native and desired non-native vertebrae species in a planning area." 36 C.F.R. § 219.19 (1992). In keeping with its regulations, the Forest Service at times designates "sensitive species" for which population viability is a concern within a particular planning area. Ongoing Forest Service programs and proposed actions which may have an effect on a sensitive species must be reviewed in a BE.

In the present case, the chinook salmon were identified as a sensitive species in August of 1990, one month after the ROD on the road project was issued. Thus, at the time the ROD was prepared and issued, the proposal to pave the road was not required to be evaluated in a BE. When the Regional Forester issued his decisions on the plaintiffs' administrative appeals, however, the salmon had been designated as a sensitive species. Therefore, the Regional Forester directed that a BE on the proposal be prepared pursuant to NFMA. The Regional Forester appropriately declared that ground disturbing activities could not commence unless and until the BE was complete and a finding of "no effects" was documented. The Regional Forester further stated that if the BE did not result in a "no effects" finding, the forest supervisors would have to modify the original decision on the project or issue a new decision.

---

3. The decisions of the Regional Forester are found in Volume 1 of the Administrative Record filed by the Forest Service on December 30, 1992, at pages 000600 and 000610.

On February 28, 1991, a BE on the road project was prepared by Robert D. Ries, a Payette National Forest fisheries biologist.[4] The BE found that the project would significantly reduce the amount of sediments being introduced into the river. The BE then weighed the benefits of reduced sedimentation and improved spawning habitat in the river against the potential adverse effects of the project. The BE noted that the mitigation measures identified in the ROD would offset the short-term adverse effects from the construction itself. The BE further found that the long term risks of toxic spills and disturbances associated with access over the road would remain essentially the same. Mr. Ries therefore concluded that the benefits of long-term reduction of sediments and improved salmon habitat in the river outweighed the potential adverse effects of the project. Thus, the BE concluded that the proposal to pave the SFSR road was not likely to have an adverse effect on chinook salmon.

Consequently, in December of 1991, the Forest Service awarded a construction contract to Tidewater Construction Company ("Tidewater") to perform the work on the road. Initial work on the project began in the spring of 1992. Then, on May 22, 1992, the National Marine Fisheries Service ("NMFS") formally listed the spring/summer and fall chinook salmon as a threatened species under the Endangered Species Act. NMFS also listed the South Fork of the Salmon River as part of the proposed critical habitat for the salmon.

Pursuant to its duties under the Endangered Species Act, the Forest Service prepared a Biological Assessment ("BA") for the purpose of consultation with NMFS.[5] The BA was prepared by Dr. David Burns, a Payette National Forest fisheries biologist, and sent to NMFS on June 12, 1992. Dr. Burns concluded that the project was likely to have an adverse impact on the salmon or their habitat. However, he went on to conclude that with appropriate mitigation measures the project could go forward and reach its goal of reducing the volume of sediments being introduced into the river. Dr. Burns then declared that "[b]ecause of the status of the habitat and chinook salmon populations, I believe that some level of risk must be taken in order to restore habitat for viable populations in this watershed."[6]

In light of the findings of the BA, the Forest Service proceeded to engage in formal consultation with NMFS under Section 7 of the Endangered Species Act, 16 U.S.C. § 1536, and 50 C.F.R. § 402.14, as to the advisability of going forward with the SFSR road project. On July 6, 1992, the Forest Service directed Tidewater to scale back construction work to only those prepaving activities which NMFS agreed would not constitute an irretrievable or irreversible commitment of resources while formal consultation proceeded.

On July 23, 1993, Dr. Burns prepared an amendment to the BA in which he addressed the limited construction activities approved by NMFS.[7] In the amendment, he determined that replacement of undersized or worn culverts, construction of cutslope retaining walls and other erosion control measures, and administrative road closures were likely to have a beneficial effect on the salmon and/or their habitat. He further found that the clearing of vegetation for the right-of-way was not likely to have an adverse effect, and that all of these actions in combination were likely to have a beneficial effect on the listed salmon.[8] He also concluded

---

4. The BE of Robert D. Ries prepared on February 28, 1991, is found in Volume 1 of the Administrative Record filed by the Forest Service on December 30, 1992, at page 000616.

5. The BA of Dr. David Burns prepared on June 12, 1992, is found in Volume 1 of the Administrative Record filed by the Forest Service on December 30, 1992, at page 000635.

6. *Id.* at 000646.

7. The amendment to the BA prepared by Dr. David Burns on July 23, 1992, is found in Volume 1 of the Administrative Record filed by the Forest Service on December 30, 1992, at page 000651.

8. The court notes that on August 3, 1992, the Forest Service directed that vegetation clearing on a section of the road be stopped pursuant to the direction of NMFS. *See* Work Order and Notice of Noncompliance, dated Aug. 3, 1992, in

that these activities would not constitute an irretrievable or irreversible commitment of resources which would preclude the implementation of reasonable alternatives.

Consultation between the Forest Service and NMFS continued. At one point, a rock slide occurred in an area near the road. The slide represented an immediate threat to the river and the salmon. The Forest Service prepared a second amendment to the BA addressing its proposal to construct a buttress to prevent the slide from reaching the river.[9] Dr. Burns concluded that the construction of the buttress was not likely to have an adverse effect and would most likely benefit the salmon by preventing the slide, and/or sediments from the slide, from going into the river. NMFS concurred with the Forest Service that this work should be done.

In December of 1992, consultation between the Forest Service and NMFS focused on the narrower and more immediate issue of winter snow removal. The residents of the town of Yellow Pine, plaintiffs in the related case of *Mountain States Legal Foundation v. Espy, supra,* sought permission to have the road plowed so that they could have winter access to their inholdings in the Yellow Pine area. NMFS determined that snow removal could take place under certain specified conditions. These conditions prompted the plaintiffs in the *Mountain States* case to move to reopen their action and challenge the conditions.

The plaintiffs in *Mountain States* sought an order from the court permitting winter access and snowplowing in the usual and customary manner pending ultimate resolution of that case. On December 21, 1992, the court granted the motion to reopen and ordered the Forest Service to allow public access over the SFSR road until further order from the court. In that order, the court imposed certain restrictions with respect to snow removal and authorized the Forest Service to close the road when weather condi-

tions were likely to damage the road and/or increase sedimentation into the South Fork of the Salmon River.

On September 24, 1993, the court ruled on the cross-motions for summary judgment in the *Mountain States* case. The court ruled that the plaintiffs have a right of access over the SFSR road under the Alaska National Interest Lands Conservation Act, 16 U.S.C. § 3210(a), a point conceded by the government. However, the court ruled that this right of access is subject to reasonable regulation by the Forest Service, including restrictions on the method of snowplowing. The court ruled that the Forest Service must be permitted to regulate access over the road in order to fulfill its obligation under the Endangered Species Act to protect the threatened species of salmon. The court was of the opinion that the Forest Service was doing its utmost, under difficult circumstances, to meet its dual obligations under ANILCA and the Endangered Species Act.

On April 8, 1993, NMFS issued a Biological Opinion ("BO") on the Forest Service proposal to pave the SFSR road.[10] The BO reviewed the biological information, assessed the impacts and cumulative effects of the project, and concluded the SFSR road project is not likely to jeopardize the continued existence of the Snake River spring/summer and fall chinook salmon. In reaching this conclusion, NMFS weighed the beneficial effects (long-term decrease in sediment levels and long-term increase of 4.5 miles of habitat) against the potential adverse effects (short-term increase in sediment levels caused by the construction itself and long-term increase in traffic on the road). NMFS declared that the projected reduction in sediment levels is expected to improve significantly the egg-to-fry survival of the salmon in this spawning area. NMFS found that the project would benefit the salmon by improving access into tributaries such as Cabin,

Vol. 1, Administrative Record filed by Forest Service Dec. 30, 1992, at 000673.

9. The second amendment to the BA is found in Volume 3 of the Administrative Record filed by the Forest Service on December 30, 1992, at page 002133.

10. The Biological Opinion of NMFS prepared on April 8, 1993, is found in Volume 1 of the Administrative Record filed by NMFS on June 25, 1993, at page 0133.

Goat, and Fourmile Creeks through the planned removal of fish barrier culverts.

NMFS further found that the short-term sediment increase was not likely to jeopardize the continued existence of the salmon. It noted that much of the work predicted to cause a short-term increase in sedimentation had already occurred; the identified sediment disturbing activities (excavating cutslopes, placing fill material, and removing culverts) were completed in the 1992 construction season. NMFS further noted that the Forest Service had implemented extensive mitigation measures (and conditions developed through consultation with NMFS) which enabled it to avoid much of the expected short-term increase in sedimentation. Monitoring samples taken from the river in the 1992 construction season showed negligible amounts of sediment loading. In addition, NMFS stated that implementation of the additional mitigation measures contained in the BO would further reduce any risks to the species of short-term increases in sedimentation associated with the remaining construction activities.

NMFS further concluded that through the development and implementation of a road use and management plan by the Forest Service, the indirect effects of the project (increased vehicular traffic, recreational access, and toxic spill risk) were not likely to jeopardize the salmon. The road use and management plan is both a feature of the project and is included in the terms and conditions of the incidental take section of the BO. NMFS went on to conclude that the road use and management plan, combined with the terms and conditions set forth in the BO, would actually reduce the risk of toxic spills and the risks associated with recreational use of the road. In its combined effects analysis, NMFS concluded that the road project would likely reduce the level of human-induced mortality of the salmon.

On June 6, 1993, the plaintiffs filed a Motion for Preliminary Injunction, which was referred to United States Magistrate Judge

Larry M. Boyle. Magistrate Boyle conducted two days of evidentiary hearings on this motion. After careful and detailed consideration of the evidence and testimony offered by both sides, Magistrate Boyle found that the plaintiffs had failed to demonstrate that the salmon, its habitat, or the public would suffer any irreparable harm if the Forest Service continued with its pre-paving construction activities on the road. On the contrary, Magistrate Boyle found that leaving the road in its present unstable condition could have catastrophic effects on salmon habitat.

In his opinion, Magistrate Boyle concluded that a preliminary injunction enjoining all activities on the road could not be entered because to do so would further injure or possibly irreparably harm the endangered species. He found that many of the activities being conducted were designed to reduce sedimentation and/or improve salmon habitat. Magistrate Boyle also concluded that the only work on the project which would constitute irreversible or irretrievable action would be the actual asphalt paving. Therefore, Magistrate Boyle determined that the Forest Service should not begin paving until this action is finally resolved on the merits.

The plaintiffs filed objections to the findings and conclusions reached by Magistrate Boyle.[11] The court will construe these as objections to Magistrate Boyle's proposed findings of fact and recommendations on the motion. The defendants responded to the objections on August 23, 1993, and the court then held a hearing on the cross-motions for summary judgment on September 16, 1993. Given the fact that the court is now ruling on the merits of the case, the court need not address these objections or resolve the question of whether preliminary injunctive relief is appropriate in this matter.

## II. ANALYSIS

The court will first address the defendants' motion to dismiss for lack of jurisdiction.

---

11. The court notes that Magistrate Boyle entered an order addressing the plaintiffs' motion. Under 28 U.S.C. § 636(b)(1)(A), a United States magistrate judge may not make a final ruling on a motion for injunctive relief. Rather, the magistrate judge may make proposed findings of fact and recommendations to the court pursuant to 28 U.S.C. § 636(b)(1)(B). This is a minor procedural oversight in this case which will not prejudice the plaintiffs in any way.

Then the court will address the cross-motions for summary judgment filed by the plaintiffs and the defendants. Finally, the court will address the Motion for Summary Judgment filed by Intervenor/Cross–Claimant Boise Cascade Corporation.

### A. *Motion to Dismiss*

██ The defendants have moved to dismiss the plaintiffs' First Amended Complaint for lack of jurisdiction. The defendants contend that in filing their First Amended Complaint, the plaintiffs failed to comply with the 60–day jurisdictional notice requirement under the Endangered Species Act.[12] Specifically, the defendants contend that the plaintiffs' claim that the BO prepared by NMFS is inadequate should be dismissed.

The plaintiffs sent two letters of intent to sue to the Forest Service and NMFS. These letters, dated April 10, 1992, and June 24, 1992, informed the Forest Service and NMFS that the plaintiffs intended to sue the Forest Service for its failure to seek and NMFS for its failure to prepare a BO on the Forest Service proposal to pave the SFSR road, as required by the Endangered Species Act. As the facts now stand, the Forest Service has engaged in formal consultation with NMFS on this proposal, and NMFS prepared and issued a BO on April 8, 1993.

It is undisputed that when the plaintiffs sought to amend their complaint, and when the court allowed the First Amended Complaint to be filed, the plaintiffs did not give the Forest Service or NMFS 60–days' notice of their intent to sue NMFS challenging the adequacy of the BO. The Ninth Circuit Court of Appeals has held that compliance with the 60–day notice provision is jurisdictional, not procedural. *See Save the Yaak Committee v. Block*, 840 F.2d 714, 721 (9th Cir.1988) (failure to give notice deprives the court of subject matter jurisdiction, and Endangered Species Act claim or claims must be dismissed).

In this case, the plaintiffs gave notice of their claim against the agencies for failure to consult and/or prepare a BO. The plaintiffs argue that they were not required to give additional notice of their later claim that the BO prepared by NMFS was inadequate. The court has carefully reviewed the cases cited by the parties on both sides of this issue. Based upon this review, the court agrees with the position taken by the defendants. The purpose of the 60–day notice provision is to put the agencies on notice of a perceived violation of the statute and an intent to sue. When given notice, the agencies have an opportunity to review their actions and take corrective measures if warranted. The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation.

Thus, the court is inclined to grant the defendants' motion to dismiss the plaintiffs' claim that the BO is inadequate. However, this case has a unique procedural history. Since its inception, the parties have worked hard to expedite this case, and the court has worked with them to facilitate this goal. The parties now have cross-motions for summary judgment pending before the court which have been *voluminously* briefed. In addition, the defendants have persuaded the court that they are entitled to summary judgment on all claims advanced by the plaintiffs. Therefore, given the unique circumstances of this case and the fact that the defendants will not be prejudiced, the court will not dismiss the claim that the BO is inadequate. Rather, the court will address this claim on the merits.[13]

### B. *The Summary Judgment Standard*

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure. Rule 56 provides, in pertinent part, that judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show

---

**12.** "No action may be commenced [under the Endangered Species Act] ... prior to sixty days after written notice of the violation has been given to the Secretary, and to any alleged violator of any such provision or regulation...." 16 U.S.C.S. § 1540(g)(2)(A)(i) (Law. Co-op.1984).

**13.** The court specifically declares that this ruling is in no way intended to serve as precedent with respect to the mandatory 60–day notice provision of the Endangered Species Act.

that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

The Supreme Court has made it clear that under Rule 56 summary judgment is mandated if the nonmoving party fails to make a showing sufficient to establish the existence of an element which is essential to his case and upon which he will bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). If the nonmoving party fails to make such a showing on any essential element of his case, "there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* at 323, 106 S.Ct. at 2552.[14]

Moreover, under Rule 56, it is clear that an issue, in order to preclude entry of summary judgment, must be *both* "material" and "genuine." An issue is "material" if it affects the outcome of the litigation. An issue, before it may be considered "genuine," must be established by "sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial." *Hahn v. Sargent*, 523 F.2d 461, 464 (1st Cir.1975) (*quoting First Nat'l Bank v. Cities Serv. Co., Inc.*, 391 U.S. 253, 289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968)). The Ninth Circuit cases are in accord. *See e.g., British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir.1989).

According to the Ninth Circuit, in order to withstand a motion for summary judgment, a party

(1) must make a showing sufficient to establish a genuine issue of fact with respect to any element for which it bears the burden of proof; (2) must show that there is an issue that may reasonably be resolved in favor of either party; and (3) must come

forward with more persuasive evidence than would otherwise be necessary when the factual context makes the non-moving party's claim implausible.

*Id.* at 374 (citation omitted).

## C. *Cross–Motions for Summary Judgment*

In their first claim for relief, the plaintiffs allege that the defendants violated NEPA because the FEIS was inadequate and because the Forest Service failed to prepare a Supplemental Environmental Impact Statement ("SEIS") on the proposal to pave the SFSR road. In their second claim for relief, the plaintiffs allege violations of the Endangered Species Act. Specifically, the plaintiffs allege that the Forest Service made an irretrievable or irreversible commitment of resources to the proposal to pave the SFSR road prior to completion of consultation with NMFS; that the BO issued by NMFS is inadequate; that the road project jeopardizes the continued existence of the threatened spring/summer and fall chinook salmon; and that if the project is allowed to proceed, it will result in an unlawful taking of these threatened species of salmon in violation of Section 9 of the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B).

In their third claim for relief, the plaintiffs allege that the defendants violated the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551–706, by failing to prepare an SEIS on the road project; by failing to consult adequately on the project; and by taking a threatened species without a permit as required by Section 9 of the Endangered Species Act. In their fourth claim for relief, the plaintiffs allege that the defendants violated procedural and substantive requirements set forth in the Payette National Forest LRMP.

The plaintiffs and the defendants have filed cross-motions for summary judgment on

---

**14.** *See also* Rule 56(e), which provides in part: When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.
Fed.R.Civ.P. 56(e).

all of the claims brought by the plaintiffs. The court will now address each of these claims in turn.

### 1. *NEPA claims.*

■ In their first claim for relief, plaintiffs allege that the defendants violated NEPA. The court reviews agency decisions under NEPA to determine whether the decisions are arbitrary, capricious, or an abuse of discretion. *See Friends of the Payette v. Horseshoe Bend Hydroelectric Co.*, 988 F.2d 989, 993 (9th Cir.1993); *Greenpeace Action v. Franklin*, 982 F.2d 1342, 1349 (9th Cir.1992).

This standard of review is highly deferential. While the court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment," and while "this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one." ... The court may not set aside agency action as arbitrary or capricious unless there is no rational basis for the action.

*Friends of Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir.1986) (citation omitted).

■ NEPA is essentially a procedural statute, and it is not the function of this court to direct a particular substantive outcome, or to substitute its judgment for that of the agency. *See Strycker's Bay Neighborhood Council, Inc. v. Karlen*, 444 U.S. 223, 227, 100 S.Ct. 497, 499, 62 L.Ed.2d 433 (1980); *Vermont Yankee Nuclear Power Corp. v. National Resources Defense Council, Inc.*, 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978); *Natural Resources Defense Counsel, Inc. v. Hodel*, 819 F.2d 927, 929 (9th Cir.1987).

Neither the statute [NEPA] nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.... The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken."

*Kleppe v. Sierra Club*, 427 U.S. 390, 410, n. 21, 96 S.Ct. 2718, 2730, n. 21, 49 L.Ed.2d 576 (1976) (citations omitted).

■ The plaintiffs first argue that in deciding their administrative appeals, the Regional Forester found the FEIS on the SFSR road project to be incomplete or inadequate. The court is of the opinion that the plaintiffs misconstrue the decisions of the Regional Forester. The Regional Forester addressed each of the plaintiffs' specific concerns regarding cumulative or indirect impacts of the project and found that these specific matters were adequately addressed in the FEIS. He did declare, however, that because the Forest Service had identified the salmon as a sensitive species under NFMA, the Forest Service should prepare a BE on the project pursuant to Forest Service regulations and policies. The BE was intended to analyze further the cumulative impacts of the project in light of the fact that the Forest Service had identified the salmon as a sensitive species. The Regional Forester did not declare that an SEIS had to be prepared.

■ The plaintiffs contend in their memoranda that the Regional Forester directed the preparation of a BE as a supplemental NEPA document required to be circulated for public comment. Again, the court does not agree. A BE is prepared pursuant to NFMA. While the Forest Service often prepares a BE concurrently with documents required under NEPA, the Forest Service is not required by law to secure public comment on a BE. The court also defers to the interpretation by the Forest Service of its own manual provisions governing BEs—that a BE does not trigger all of the procedural formalities accompanied by documents generated under NEPA.

The primary NEPA challenges brought by the plaintiffs are that the original FEIS was inadequate and that the Forest Service should have prepared and filed an SEIS on the project. The court will first address whether the original FEIS was adequate. The Ninth Circuit has declared:

The standard which a district court must apply in assessing the adequacy of an EIS is two-fold. First, under the Administrative Procedure Act, NEPA's procedural re-

quirements must be observed.... Second, the court must determine whether the EIS accomplishes its purpose, which is both to provide decision makers with enough information to assist them in deciding whether to proceed with a project in light of its environmental consequences, and to provide the public with information and the chance to participate in gathering information.

*Natural Resources Defense Counsel v. Hodel,* 819 F.2d at 929 (citations omitted).

The court has carefully and thoroughly reviewed the entire record in this matter, including the FEIS on the Forest Service proposal to pave the SFSR road. The court is greatly impressed by the level of detail and the obvious care taken by the Forest Service which is evident in the FEIS and all of the other studies and reports either compiled or reviewed by the Forest Service in relation both to the project itself and to the health and continued viability of the threatened salmon and the habitat in the South Fork of the Salmon River. The court notes that officials in both the Payette and Boise National Forests, working independently and using the best scientific methods and information available, reached the same conclusion—that paving the road would be the most effective way to prevent sediments from being washed from the road into the river. The court is certainly persuaded that, in reaching its decision to pave the road to alleviate the severe sedimentation problem, the Forest Service took the necessary "hard look" at the environmental consequences of its proposed action.

(a) *Adequacy of FEIS and ROD.*

■ The plaintiffs complain that the FEIS failed to consider adequately the cumulative impacts [15] and/or indirect effects [16] of the project. They refer specifically to potential increases in logging and mining activity in the area; increased private and/or recreational use of the road; and the potential increase in the likelihood of hazardous spills in the South Fork of the Salmon River if the road is paved. The court finds that the FEIS provides a more than adequate assessment of the impacts of potential increased commercial, private, and/or recreational traffic on the road and the risk of toxic spills. In addition, the Forest Service has developed a road management plan (Appendix E of the FEIS) addressing these concerns. The court is also persuaded that the Forest Service has adequately assessed the potential impacts on logging and mining activity.

Few projects and few specific geographic areas have been the subject of more study and close attention than the SFSR road project and the South Fork of the Salmon River, its tributaries, and surroundings. Although the chinook salmon were not listed as a threatened species until May of 1992, the Forest Service has been managing this area since 1965 as though the salmon were threatened.[17] Primary consideration in management decisions has been given to the welfare of the salmon and the health of the habitat provided by the river and its tributaries. Since 1965, the salmon and the habitat have been repeatedly studied and continually monitored.

For example, the Forest Service and the Idaho Department of Fish and Game began a joint study in 1965 to assess the sedimenta-

---

**15.** Title 40 C.F.R. § 1508.7 (1992) defines a cumulative impact as:

[T]he impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

**16.** Title 40 C.F.R. § 1508.8(b) (1992) defines an indirect effect as effects which are "caused by the action and are later in time or farther re-

moved in distance, but are still reasonably foreseeable. Indirect effects may include growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."

**17.** At that time, severe rainstorms washed a great deal of sediment into the river, causing the Forest Service to focus on the health of the salmon habitat, the advisability of continued timber harvesting, and the need for remedial measures in the planning unit.

tion problem and to develop remedial measures. The result was a rehabilitation program which closed and revegetated over 500 miles of logging roads in the SFSR planning unit. A virtual moratorium on logging in the area was also imposed from 1965–1977.

In the 1977 Land Management Plan for the SFSR planning unit, the salmon were recognized as the most valuable resource in this area and the Forest Service conditioned all land disturbance activities on continued habitat improvement. The Forest Service has had teams of scientists annually monitoring the salmon and the activities within the SFSR planning unit. The Forest Service once again imposed a moratorium on logging in the area in 1983. This moratorium is still in effect, and the ROD on the SFSR road project states that resource outputs will not be changed by the decision to pave the road. In addition, a policy of "no net increase" in sedimentation is in place in the SFSR drainage. At the hearing, counsel for the Forest Service reaffirmed the fact that the Forest Service has no present intention to award timber contracts in the drainage.

The Ninth Circuit has identified six factors to be considered in determining whether logging operations and construction of a road are "connected actions" within the meaning of 40 C.F.R. § 1508.25(a)(1) and, therefore, must be discussed in the same environmental impact statement. *See Thomas v. Peterson*, 753 F.2d 754, 758–59 (9th Cir.1985); *Save the Yaak Committee v. Block*, 840 F.2d 714, 719 (9th Cir.1988). The Ninth Circuit noted that the determining factors were:

(1) the Forest Service characterized the road as a logging road, (2) the environmental assessment stated that the reason the road was built was to "access the timber lands to be developed over the next twenty years," (3) the "no action" alternative was rejected because "that alternative would not provide the needed timber access," (4) "the cost-benefit analysis of the road considered the timber to be the benefit of the road," (5) the Forest Service did not claim that other "benefits would justify the road in the absence of the timber sales," (6) a letter was written to the Forest Supervisor from the Regional Forester that stated:

"We understand that sales in the immediate future will be dependent on the early completion of portions of the Jersey Jack Road. It would be advisable to divide the road into segments and establish separate completion dates for those portions to be used for those sales."

*Save the Yaak Committee v. Block*, 840 F.2d at 719 n. 2 (*citing Thomas v. Peterson*, 753 F.2d at 758–59).

The present case does not involve the building of a new road. This case involves an old forest development road once used for logging in the area. The Forest Service now wishes to pave the road to alleviate a severe sediment problem and to improve access to the town of Yellow Pine, Idaho. The record clearly shows that paving the road will substantially reduce sediments flowing from the road into the South Fork of the Salmon River caused by weather conditions and public use of the road. None of the factors identified by the Ninth Circuit are present in the case at hand.

In summary, the record shows that there is now, and there has been for much of the time since 1965, a moratorium on timber harvesting in the drainage of the South Fork of the Salmon River because of the sediment problem. The "no net increase in sediment" policy is in effect. The ROD provides that the project will not alter timber outputs. The Forest Service has no plans to award timber contracts in the area in the foreseeable future. Under these circumstances, and given the long history of careful study and monitoring of the salmon and salmon habitat in this area, and the resulting management decisions by the Forest Service, the court finds that the FEIS and ROD adequately assess the likely cumulative and/or indirect impacts of timber harvesting to be caused by the SFSR road project.

Much of the preceding discussion is equally applicable to the plaintiffs' contention that the ROD and FEIS fail to assess adequately the impacts the project may have on mining activity in the area. In addition, Dr. Burns noted in his BA that

legitimate mining claims in the South Fork Salmon River watershed are developed with or without paved roads. The mining

activities in and around the area do not correspond with the location of paved roads. Some of the largest active mines, at Thunder Mountain and Stibnite, occur many miles from paved roads.... Access patterns to these mines and other private property might change and this is considered in the record for this project.

BA of Dr. David Burns prepared June 12, 1992 (Vol. 1, Administrative Record filed by Forest Service Dec. 30, 1992, at 000639).

(b) *Supplementation of the FEIS.*

■ The plaintiffs also allege that the defendants violated NEPA by failing to file an SEIS on the proposal to pave the SFSR road. The plaintiffs argue that an SEIS should have been prepared after the spring/summer and fall chinook salmon were listed as threatened species on May 22, 1992. The plaintiffs argue that the listing created significant new circumstances and significant new information which were not considered in the FEIS and ROD.

Regulations promulgated by the Council on Environmental Quality ("CEQ") require agencies to supplement either draft or final environmental impact statements if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1)(ii) (1992). The United States Supreme Court has set the standard governing an agency's decision whether to prepare an SEIS. The Supreme Court has declared that agencies shall employ a "rule of reason" in making this determination. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 373, 109 S.Ct. 1851, 1859, 104 L.Ed.2d 377 (1989).

[A]n agency need not supplement an EIS every time new information comes to light after the EIS is finalized. To require otherwise would render agency decisionmaking intractable, always awaiting updated information only to find the new information outdated by the time a decision is made.... Application of the "rule of reason" thus turns on the value of the new

information to the still pending decision-making process. In this respect the decision whether to prepare a supplemental EIS is similar to the decision whether to prepare an EIS in the first instance: If there remains "major Federal actio[n]" to occur; and if the new information is sufficient to show that the remaining action will "affec[t] the quality of the human environment" in a significant manner or to a significant extent not already considered, a supplemental EIS must be prepared.

*Id.* at 373–74, 109 S.Ct. at 1859. The Court went on to declare that the narrow question of whether an agency decision not to supplement an EIS should be set aside is governed by the arbitrary and capricious standard of Section 706(2)(A) of the APA. *Id.* at 376, 109 S.Ct. at 1860. The Court also cautioned that where the decision rests upon a high level of technical expertise, the court should defer to "'the informed discretion of the responsible federal agencies.'" *Id.* at 377, 109 S.Ct. at 1861 (*quoting Kleppe v. Sierra Club,* 427 U.S. 390, 412, 96 S.Ct. 2718, 2731, 49 L.Ed.2d 576 (1976)).[18]

As noted above, the South Fork of the Salmon River has been carefully studied and monitored by the Forest Service since 1965. The Forest Service has given utmost priority in this area to the preservation of the chinook salmon and the habitat provided by the river and its tributaries. The decision to pave the SFSR road was prompted in large part by the desire of the Forest Service to reduce sediments in the river and improve the salmon habitat. The FEIS and ROD gave careful attention to the effects the project would have on the salmon. The precarious population levels of the salmon and the effects of sedimentation from the road have been given detailed consideration by the Forest Service. In fact, these factors played a major role in the decision to pave the road as the best means of curing the problem of sedimentation from the road.

After an exhaustive and detailed review of the entire record in this matter, as well as the arguments of the plaintiffs, the court

---

**18.** *See also Baltimore Gas & Electric Co. v. Natural Resources Defense Council, Inc.,* 462 U.S. 87, 103, 103 S.Ct. 2246, 2255, 76 L.Ed.2d 437 (1983)

("When examining this kind of scientific determination ... a reviewing court must generally be at its most deferential.").

finds that the decision by the Forest Service not to prepare an SEIS was clearly *not* arbitrary and capricious. The listing of the chinook salmon did not provide new information or change the conditions of the salmon or the habitat of the South Fork of the Salmon River. The listing may have changed the *legal* status of the salmon, but it did not change the *biological* status. The listing did not require yet another in the long line of studies and opportunities for public involvement in decisions relating to the South Fork of the Salmon River, the sediment problem, and the SFSR road. The rule of reason dictates that the studies and public comments may now come to an end.

As noted above, it is difficult to imagine a portion of national forest receiving more attention than the area surrounding the South Fork of the Salmon River. The court is frankly surprised by the plaintiffs' suggestion that anadromous fish and their habitat have not received adequate attention in the SFSR drainage when these fish have in fact received primary consideration since 1965. The principal purpose of the SFSR road project is to improve chinook salmon habitat. The participating federal agencies have unanimously agreed that the project will significantly improve the habitat. In attempting to delay this project the plaintiffs are themselves placing the salmon in further jeopardy.

In conclusion, the court finds that the Forest Service has complied with the procedural requirements of NEPA; that the FEIS and ROD on the SFSR road project are adequate; and that the Forest Service decision not to prepare an SEIS was not arbitrary and capricious. Under the standards enunciated above, the court cannot find that the Forest Service has in any way made decisions or taken actions which are arbitrary, capricious, or an abuse of appropriate agency discretion. The court is confident that the Forest Service took the necessary hard look at the environmental consequences of the SFSR road project.

### 2. *Endangered Species Act Claims.*

This court's review of the administrative decisions at issue under the Endangered Species Act is controlled by Section 706 of the APA.

Under section 706, the reviewing court must satisfy itself that agency decisions are not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." ... The relevant inquiry is whether the agency " '*considered the relevant factors and articulated a rational connection between the facts found and the choice made.*' "

*Pyramid Lake Paiute Tribe v. United States Dept. of Navy,* 898 F.2d 1410, 1414 (9th Cir.1990) (citations omitted) (emphasis added).

(a) *Irreversible commitment of resources.*

■ The plaintiffs claim that the Forest Service violated the Endangered Species Act by making an irretrievable or irreversible commitment of resources to the project prior to completion of consultation with NMFS. The court has carefully reviewed the record and finds that the Forest Service has not violated the statute in this regard. The work that has been performed on the road was completed prior to the listing of the salmon or was done with the approval of NMFS. The preliminary work approved by NMFS was done in an effort to control severe erosion problems associated with the road or to begin improving salmon habitat immediately. Furthermore, the court finds that none of the work constituted an irretrievable or irreversible commitment of resources that would preclude or did preclude the Forest Service from pursuing other alternatives, including permanent closure of the road, had NMFS not determined in its BO that the project would not jeopardize the continued existence of the salmon.

(b) *Inadequate consultation.*

■ The plaintiffs next contend that the BO issued by NMFS is inadequate, and that the Forest Service and NMFS have not fulfilled their consultation duties under Section 7(a)(2) of the Endangered Species Act. The plaintiffs maintain that the consultation process and the resulting BO failed to consider the full scope of the proposed project. Specifically, they insist that because the Forest

Service at one time had proposed to close portions of the SFSR road, the consultation process and the BO should assess the effects of the difference between closing portions of the road and the project as it now stands. The court disagrees.

The duties of NMFS during formal consultation under Section 7 of the Endangered Species Act include the following:

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

50 C.F.R. § 402.14(g)(1)–(4) (1992).

"Effects of the action" are defined as "the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, that will be added to the environmental baseline." *Id.* § 402.02 (1992). The "environmental baseline" is defined as follows:

The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process.

*Id.*

The court can find no authority to support the plaintiffs' contention that the agencies were required to consult on an alternative course of action abandoned by the Forest Service more than two years before formal consultation on the project at issue began. Nor is NMFS required to develop and evaluate alternatives to the action proposed by the Forest Service; it must simply evaluate the *effects of the proposed action,* here the proposal to pave the SFSR road, given the present environmental baseline.

The proper view of the environmental baseline at the time consultation began is that of the Forest Service managing an unpaved road responsible for substantial amounts of sediments flowing into the South Fork of the Salmon River, and the Forest Service proposing to pave the road in an effort to cure this problem and to provide access under ANILCA for the inholders in the Yellow Pine area. The SFSR road has never been closed and converted to a trail. NMFS and the Forest Service were not required to consult on a hypothetical environmental baseline, i.e., the road as closed and converted to a trail. Such consultation is not part of the regulatory process.

In summary, the court is not persuaded by the plaintiffs' claim that the scope of the consultation or the resulting BO were inadequate. On the contrary, the court is satisfied that the formal consultation between the Forest Service and NMFS was thoroughly and conscientiously conducted, and that the resulting BO was based on the best available data.

In their First Amended Complaint, the plaintiffs also claim that the road project jeopardizes the continued existence of the threatened spring/summer and fall chinook salmon; and that if the project is allowed to proceed, it will result in an unlawful taking of these threatened species of salmon in violation of Section 9 of the Endangered Species Act, 16 U.S.C. § 1538(a)(1)(B). The plaintiffs have not argued these claims in the present cross-motions for summary judgment, and the court assumes that they have been abandoned. Nevertheless, the court has considered these claims and finds that they too are without merit.

Section 7(a)(2) of the Endangered Species Act requires federal agencies to ensure that their actions will not be likely to jeopardize the continued existence of any threatened

species, or to destroy or adversely modify the critical habitat of such species. 16 U.S.C. § 1536(a)(2). A federal action jeopardizes the continued existence of a species if it "reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." 50 C.F.R. § 402.02 (1992). No such action is contemplated here.

The nature of the plaintiffs' suit is somewhat unique. Ordinarily, in citizen suits challenging federal action under the Endangered Species Act, a concerned citizen or group of citizens sues to prevent a federal agency from initiating a project which they fear will jeopardize the continued existence of an endangered or threatened species. Conversely, in the case at hand, the SFSR road project has been proposed by the Forest Service in an effort to bring about significant and much-needed improvements in the critical habitat of a threatened species. Far from pursuing a project likely to jeopardize the continued existence of the Snake River chinook salmon, or to result in an unlawful taking of the salmon, this federal action is intended and expected to improve habitat and increase their chances for survival.

### 3. Violation of the Payette National Forest LRMP

■ The plaintiffs contend that the Forest Service amended the Payette National Forest LRMP, in conjunction with the decision to pave the SFSR road, without following the plan's procedural requirements governing the amendment process. Upon review of both LRMPs for the Payette and Boise National Forests, the court sees that each contains express authorization for amendment of the plans to respond to changing needs and opportunities, congressional actions, and/or major new management or production technology. As noted above, when Congress appropriated funds to pave the SFSR road, the Forest Service began the NEPA process of studying the environmental consequences of the proposal to pave the SFSR road.

The resulting FEIS and ROD concluded that paving the road would be the most effective means of reducing sediments flowing from the road into the river, and that the decision was consistent with the management direction of the LRMPs with respect to the South Fork of the Salmon River. Accordingly, the Forest Service amended the LRMPs. The Forest Service contends that the amendments were appropriately made and that the plaintiffs are only concerned about technical deviations from the procedural guidelines in the LRMPs.

The plaintiffs did not raise this claim at the administrative level, and it is not addressed in the administrative record. It is not clear from the record whether the amendment procedures under the LRMP were followed or not. Therefore, the court is inclined to dismiss the claim as not being ripe for judicial review because the plaintiffs failed to exhaust their administrative remedies. However, upon review of the record which is before the court, the court concurs with the Forest Service that any technical deviation on the part of the Forest Service from the procedures set forth in the LRMP was not arbitrary or capricious in this instance.

The decision to pave the road was made because it was viewed to be the best means available to alleviate the sediment problem. This decision is clearly consistent with the directives, standards, and guidelines of the Payette National Forest LRMP. While it is true that this proposal resulted in an amendment to the LRMP, the proposal and concurrent amendment were subjected to the full review process under NEPA, including public participation and comment. Furthermore, the particular management history of the South Fork of the Salmon River, the NEPA process, and the formal consultation conducted under the Endangered Species Act, have resulted in exhaustive study and monitoring of the chinook salmon and the South Fork of the Salmon River. The proposal to pave the SFSR road has been carefully studied in a manner calculated to ensure the preservation of chinook salmon and the habitat provided by the river. Therefore, the court concludes that any failure on the part of the Forest Service to adhere strictly to the procedures

for amendment of the Payette LRMP was not arbitrary or capricious.

### 4. *APA claim.*

The plaintiffs have also stated a separate claim that the defendants violated the APA. This claim is a necessary part of the plaintiffs' claims based on violations of NEPA, the Endangered Species Act, and the NFMA. The court has previously found that the defendants have not made decisions or taken actions which were arbitrary, capricious, or an abuse of discretion. Therefore, the court has already determined that the defendants have not violated the APA.

### 5. *Conclusion*

The court has conducted an exhaustive and detailed review of the entire record in this matter. The relevant facts are contained in the administrative record and are not in dispute. Accordingly, this matter is ripe for summary judgment on the legal significance of the undisputed facts. Based on the discussion set forth above, the court will enter summary judgment in favor of the defendants on all claims brought by the plaintiffs.

### D. *Boise Cascade's Motion for Summary Judgment*

Intervenor Boise Cascade has also filed a motion for summary judgment. Boise Cascade seeks summary judgment on the claims asserted by the plaintiffs and on the claims set forth in its cross-claim against NMFS.[19] Both the plaintiffs and the defendants argue that Boise Cascade lacks standing in this action, and the defendants have moved for summary judgment on this issue.

■■■ The question of standing in federal courts is considered within the framework of Article III of the United States Constitution, which restricts judicial power to "cases" and "controversies." To satisfy standing under the case or controversy requirement, Boise Cascade must show "(1) an actual threatened injury (2) traceable to the defendant's allegedly illegal conduct (3) which is likely to be redressed by the requested relief." *National Wildlife Fed'n v. Burford*, 871 F.2d 849, 852 (9th Cir.1989) (citations omitted). In *Lujan v. Defenders of Wildlife*, 504 U.S. ——, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), the Supreme Court made it clear that these elements must be met by a party challenging agency action under the Endangered Species Act.

■■■ The court has carefully reviewed the memoranda of all parties on this issue. Based upon this review, the court finds that Boise Cascade lacks standing to pursue the claims set forth in its cross-claim. Boise Cascade cannot show an actual or threatened injury in fact; nor can Boise Cascade show that the conduct complained of would be redressed by a favorable decision of the court.

Boise Cascade was allowed to intervene in this action because the court desired to hear all points of view regarding future management of the SFSR road. However, the court did not intend for Boise Cascade to file affirmative claims and/or dispositive motions of its own. The court expected Boise Cascade to brief the positions taken by the plaintiffs and defendants in their cross-motions for summary judgment and thereby provide the court with additional information and perspective. However, when pressed on the question of standing, the court must agree with the defendants that Boise Cascade lacks standing to pursue the claims set forth in its cross-claim. The court finds additional support for its decision in the recent case of *Region 8 Forest Service Timber Purchasers Council v. Alcock*, 993 F.2d 800 (11th Cir. 1993).

Furthermore, the court is of the opinion that NMFS and the Forest Service have met their respective duties under all applicable laws and regulations in this matter, and that the defendants would be entitled to summary

---

**19.** In its cross-claim, Boise Cascade alleges that NMFS failed to comply with the deadlines for completion of formal consultation under the Endangered Species Act; that NMFS has unlawfully provided for reinitiation of formal consultation; that the finding by NMFS that the project would result in an "incidental taking" was improper; and that NMFS improperly segmented the consultation process by requiring amendments to the original BA and by requiring four additional BAs on the project.

judgment on the claims asserted by Boise Cascade.

### III.  ORDER

Based on the foregoing, and the court being fully advised in the premises,

IT IS HEREBY ORDERED that defendants' Motion to Dismiss Plaintiffs' First Amended Complaint for Lack of Jurisdiction under the Endangered Species Act, filed May 28, 1993, should be, and is hereby, DENIED.

IT IS FURTHER ORDERED that plaintiffs' Motion for Summary Judgment, filed June 30, 1993, should be, and is hereby, DENIED.

IT IS FURTHER ORDERED that defendants' Motion for Summary Judgment, filed July 2, 1993, should be, and is hereby GRANTED.

IT IS FURTHER ORDERED that the Motion for Summary Judgment filed by Intervenor Boise Cascade on July 2, 1993, should be, and is hereby, DENIED.

IT IS FURTHER ORDERED that this action should be, and is hereby, DISMISSED.