Rolly PULASKI, on behalf of himself and all others similarly situated; Gloria Monroe, on behalf of herself and all others similarly situated; Raymond Acosta, on behalf of himself and all others similarly situated; Jeanette Miller on behalf of herself and all others similarly situated; and El Morro Community Association, Inc., a California corporation, Plaintiffs,

v.

Mike CHRISMAN, as Secretary of the State of California Resources Agency; Ruth Coleman, as Director of. the State of California Department of Parks and Recreation; and Does 1 through 10, inclusive, Defendants.

No. SACV 04–1320DOC(ANX).

United States District Court,
C.D. California.

Jan. 14, 2005.

Gary E. Tavetian, Hayley Elizabeth Peterson, CAAG–California Attorney Generals Office, Los Angeles, CA, for Defendants.

## ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION

CARTER, District Judge.

Before the Court is a motion by plaintiffs Rolly Pulaski, Gloria Monroe, Raymond Acosta, Jeanette Miller, and El Morro Community Association ("Plaintiffs") to enjoin defendants Mike Chrisman, in his official capacity as Secretary of State of California Resources Agency, and Ruth Coleman, in her official capacity as the Director of the California Department of Parks and Recreation, ("Defendants" or "the state") from: (1) taking any action to evict the leaseholders within the El Morro Village Mobilehome Park ("El Morro Village") in Orange County until such time as the United States Fish and Wildlife Service ("FWS") acts on the El Morro Village residents' application for a permit under Section 10 of the federal Endangered Species Act (the "ESA"), 16 U.S.C. § 1539, for removal of their mobilehomes without penalty under the ESA, and (2) taking any other action at El Morro Village that would result in the unlawful take of a species protected by the ESA before Defendants obtain FWS permission to harm each of the four federally-protected species that Plaintiffs contend will be affected by the conversion project. After reviewing the moving, opposing, and replying papers,[1] after hearing oral argument on January 3, 2005, and for the reasons set forth

Hugh Hewitt, Lawrence J. Hilton, William E. Halle, Hewitt & O'Neil, Irvine, CA, for Plaintiffs.

---

1. The Court is in receipt of Plaintiffs' Ex Parte Application regarding Plaintiffs' request that the Court consider Plaintiffs' replying papers despite the fact that Plaintiffs filed the reply one day late. The ex parte application and explanation by Plaintiffs' counsel are courteous but superfluous. The Court, in its discretion and in the interest of determining the motion for preliminary injunction on its merits, has accepted and considered the late-filed documents.

below, the Court DENIES the motion for a preliminary injunction.

## I. BACKGROUND

### A. Statutory Background

Central to the Court's discussion are certain provisions of the ESA. The ESA applies to species that are listed as "threatened" or "endangered" by either the Secretary of the Interior or the Secretary of Commerce. 16 U.S.C. §§ 1532(6), 1532(20), 1533(a), (b). The ESA states that it is unlawful for any person to "take" any endangered or threatened wildlife species. 16 U.S.C. § 1538(a)(1)(B). The definition of "person" includes state agencies and their officials. 16 U.S.C. § 1532(13). The ESA defines "take" as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. "Harm" is defined as "an act which actually kills or injures wildlife." *Id.* Any person who "takes" an endangered or threatened species may be subjected to civil or criminal penalties. 16 U.S.C. §§ 1540(a), (b). Additionally, under the ESA, "any person may seek to enjoin any person who is alleged to be in violation of any provision of [the ESA] or regulation issued under authority thereof." 16 U.S.C. § 1540(e)(6).

Although the ESA prohibits the taking of an endangered or threatened species, the ESA allows the Secretary of the Interior or Commerce to issue a person an incidental take permit ("ITP"), which "permit[s], under such terms and conditions as he shall prescribe ... (B) any taking otherwise prohibited by section 1538(a)(1)(B) of this title if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. § 1539(a)(1)(B). Any taking that occurs in compliance with the terms and conditions of an ITP is not a violation of the ESA.

### B. Factual Background

The El Morro Village is a mobile home park located in Crystal Cove State Park along the Pacific Coast Highway between Laguna Beach and Newport Beach in Orange County, California. In the 1970s, the Irvine Company owned the land in and around El Morro Village and leased the lots in the El Morro Village to the various mobile home owners that resided there. Between 1979 and 1981, the Irvine Company conveyed 2,791 acres of that land to the State and created most of what is now Crystal Cove State Park. El Morro Village occupies approximately 30 acres at the southern end of the park and contains approximately 295 mobile homes. Most of the mobile homes are located to the east of the Pacific Coast Highway, but seventy-three units are located to the west of the Pacific Coast Highway along the beach. When the state obtained ownership of the land, it continued the same landlord-tenant relationship with the residents, entering into similar lease agreements with people occupying the lots within El Morro Village. Those lease agreements were scheduled to expire at the end of December 1999, but the State agreed to extend the lease term to December 31, 2004.

In 1982, the state adopted the Crystal Cove State Park General Plan, excerpts of which Defendants have submitted as Exhibit N in opposition to the motion for preliminary injunction. The General Plan was initially approved by the Park and Recreation Commission in March 1982. Ex. N–103. The General Plan of 1982 recognizes that the El Morro Mobile Home Park is located within the park lands and

states that "[i]n lieu of relocation rights, the state has arranged 20–year leases for the current tenants.. Removal of the mobile home park will occur after the leases expire." Ex. N–107, Additionally, the public was extensively involved in formulating the General Plan by way of "questionnaire surveys and newsletters, a series of public planning meetings and workshops ... during key phases of the planning process." Ex. N–106. Thus, it appears that the Conversion Project, now overdue because of the instant dispute, has been public knowledge for at least twenty-two and a half years.

The removal of the existing mobile homes is the first step in a project to convert the existing mobile home park into a public campground ("Conversion Project"). In 2002, the California Department of Parks and Recreation prepared and certified an Environmental Impact Report for the Conversion Project. Ex. O. Because the residents of the mobile home park own their homes, the leases contain a clause that, upon expiration of the lease, the owners will relocate their property. See Ex. O–119. According to the Environmental Impact Report, "[o]nce residents have removed their mobile homes, the remaining buildings and facilities [will] be demolished and/or removed" by the state. Ex. O–113. The state will then construct campground facilities in the inland area where most of the mobile homes are located, and restore the natural beach by removing the seventy-three units to the west of the Pacific Coast Highway. The seventy-three units to the west of the Pacific Coast Highway would be removed and natural beach will be restored.

According to Plaintiffs, relocation of the individual mobile homes may require demolition of substantial improvements around the mobile homes, such as decks, support piers, fencing, masonry work, ex-

terior siding, improved roofing, and, in some cases, an entire second floor. At oral argument, Plaintiffs' counsel indicated that many of the residents of El Morro Village made substantial improvements to their homes just within the past five years, notwithstanding the residents' knowledge that their leases would soon expire at the end of 2004. Additionally, Plaintiffs assert that some of the mobile homes and abutments have become intertwined with adjacent habitats of threatened or endangered species. Removal of the mobile homes, once abutments have been demolished, will require the use of flatbed trucks and a crane. Because demolition of the improvements and removal of the mobile homes will require the use of heavy equipment, Plaintiffs assert, it will be difficult to remove the mobile homes without physically encroaching on the natural habitat within and around El Morro Village.

Plaintiffs' concerns about the surrounding habitat focus on four federally-protected species: (1) the coastal California gnatcatcher (*Polioptila californica californica*) ("gnatcatcher"), (2) the least Bell's vireo (*Vireo bellii pusillus*) ("vireo"), (3) the western snowy plover (*Charadrius alexandrinus nivosus*) ("plover"), and (4) the Pacific pocket mouse (*Perognathus longimembris pacificus*) ("pocket mouse"). According to Plaintiffs, the gnatcatcher, the plover, and the vireo are known to occur within and immediately adjacent to El Morro Village. Levine Decl., ¶ 6. The pocket mouse potentially occurs within or adjacent to El Morro Village.

In 1996, the FWS issued the California Department of Parks and Recreation an incidental take permit ("ITP") (TE068429–0) as a Participating Landowner pursuant to the Orange County Central/Coastal Natural Community Conservation Plan/Habitat Conservation Plan (NCCP/HCP). Ex. 24–355–359.[2] The ITP

---

2. The permit was actually issued on March 13, 2003. Ex. 24–355.

allows the incidental take of certain listed species under certain conditions within various areas of coastal Orange County, including Crystal Cove State Park. Levine Decl., ¶ 7. Covered species include the gnatcatcher and the pocket mouse. *Id.* Conditionally covered species include the vireo. *Id.* Conditional coverage means that in order for take of the vireo to be permitted, two conditions must be met. First, the vireo habitat must be of lesser long-term conservation value. Ex. 20–238, 24–357. Second, the Participating Land-owner must conduct surveys for the vireo and their activities must be consistent with a mitigation plan that:

1) addresses design modifications and other on-site measures that are consistent with the project's purposes, minimizes impacts, and provides appropriate feasible protections, 2) provides for compensatory habitat restoration/enhancement activities ..., and 3) provides for monitoring and Adaptive Management of habitat consistent with ... the NCCP/HCP. The mitigation plan will be developed in coordination with ... and approval by [the] USFWS.

Ex. 20–238. The plover is not a covered species under the state's ITP.

The NCCP/HCP Implementation Agreement, effective July 17, 1996, specifically states that "the Crystal Cove General Plan of 1982 is compatible with the policies of NCCP/HCP and this Agreement," and that "[n]ew facilities or improvement, repair, maintenance and operation of existing facilities in accordance with the adopted 1982 General Plan are authorized within the Reserve System." Ex. 20–265.

## II. ANALYSIS

Plaintiffs have applied for a preliminary injunction on two distinct grounds. First, Plaintiffs have applied under Federal Rule of Civil Procedure 65 to enjoin Defendants from violating Plaintiffs' procedural due process rights by evicting Plaintiffs and other leaseholders from the El Morro Village until the FWS acts on Plaintiffs' application for a permit under section 10 of the ESA. Second, Plaintiffs have applied under section 11 of the ESA, 16 U.S.C. § 1540, to enjoin Defendants from taking any action at El Morro Village that would result in the taking of any species protected by the ESA. These two claims are governed by different standards. Accordingly, each is addressed individually.

### A. Procedural Due Process Claim

■ To obtain a preliminary injunction, Plaintiffs must demonstrate: (1) a strong likelihood of success on the merits; (2) the possibility of irreparable injury; (3) greater hardship to the plaintiff than to the defendant; and (4) that the public interest favors granting the injunction. *See Johnson v. Cal. State Bd. of Accountancy,* 72 F.3d 1427, 1430 (9th Cir.1995); *Atari Games Corp. v. Nintendo of Am., Inc.,* 897 F.2d 1572, 1575 (Fed.Cir.1990) (discussing Ninth Circuit law); *State of Alaska v. Native Village of Venetie,* 856 F.2d 1384, 1388 (9th Cir.1988); *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League,* 634 F.2d 1197, 1200 (9th Cir.1980). In some situations, an "alternative test" can be applied: "When the balance of hardships tips decidedly toward the plaintiff," a preliminary injunction may be issued upon a less rigorous showing of likelihood of success on the merits so long as the plaintiff's allegations raise "serious questions" as to the merits. *Caribbean Marine Servs. Co. v. Baldrige,* 844 F.2d 668, 674 (9th Cir. 1988); *Am. Motorcyclist Ass'n v. Watt,* 714 F.2d 962, 965 (9th Cir.1983); *Stanley,* 13 F.3d at 1319.

These different formulations of the test represent different points on a continuum. *See Big Country Foods, Inc. v. Bd. of Educ.,* 868 F.2d 1085, 1088 (9th Cir.1989);

*Oakland Tribune, Inc. v. Chronicle Publ'g Co.*, 762 F.2d 1374, 1376 (9th Cir.1985); *Regents of Univ. of Cal. v. Am. Broad. Cos.*, 747 F.2d 511, 515 (9th Cir.1984) (describing various formulations of the tests and stating, "Long or short, old or new, these tests are not separate tests but the outer reaches of a single continuum.") (internal citations and quotation marks omitted). Under whichever test is applied, the plaintiff must "demonstrate that there exists a significant threat of irreparable injury." *Oakland Tribune*, 762 F.2d at 1376. Furthermore, under whichever test is applied, the plaintiff must show, "as an irreducible minimum[,] ... a fair chance of success on the merits." *Martin v. Int'l Olympic Comm.*, 740 F.2d 670, 675 (9th Cir.1984); *Cairns v. Franklin Mint Co.*, 24 F.Supp.2d 1013, 1037 (C.D.Cal.1998).

The substance of Plaintiffs' claim against Defendants is that the state, in its role as landlord, failed to comply with its own state law "by, among other things, negligently or intentionally withholding from the residents material information known to the State, and thereby creat[ed] the dilemma the residents now face." App. for Preliminary Injunction, p. 16. The referenced dilemma is that Plaintiffs have the choice of either removing their homes and risking civil or criminal penalties under the ESA or abandoning their homes by leaving them at the mobile home park. Both parties spill much ink over the question of whether Plaintiffs are actually at risk of violating the ESA, but the glaring defect in Plaintiffs' application for preliminary injunction is in the content of their claim.

1. **Likelihood of Success on the Merits**

Plaintiffs have demonstrated no likelihood of success on the merits of their claim that Defendants violated Plaintiffs' procedural due process rights by negligently or intentionally withholding material information that was known to Defen-

dants. Plaintiffs' claim fails for a number of reasons. First, Plaintiffs' claim that the alleged violation of California state law amounts to a violation of procedural due process fails. The "root requirement" of the Due Process Clause is "that an individual be given an opportunity for a hearing before he is deprived of any significant property [or liberty] interest." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985). Thus, to state a claim for a violation of a procedural due process right, Plaintiffs must demonstrate that the state law gives rise to a constitutionally protected property interest and that Plaintiffs have been deprived of such an interest without adequate process. *See Loudermill*, 470 U.S. at 538, 542, 105 S.Ct. at 1491, 1493. Plaintiffs have omitted this basic procedural due process analysis from any of their papers and they failed to address it at oral argument. Moreover, it does not appear that the state common law of fraudulent misrepresentation gives rise to a constitutionally protected liberty or property interest. Further, after numerous lawsuits pertaining to the termination of their leases, Plaintiffs cannot claim that they have been denied adequate process.

But even if Plaintiffs could successfully establish that California common law creates a constitutionally protected property interest and that Plaintiffs have not received due process of law, it is not at all clear that Defendants have actually violated California common law. In support of their argument, Plaintiffs cite to California law that bears little or no relation to the facts before this Court. The proposition of law that forms the basis of Plaintiffs' claim is that "a party to a business transaction has a duty to disclose when the other party is ignorant of material facts which he does not have an opportunity to discover." *In re Apte*, 96 F.3d 1319, 1324 (9th Cir. 1996) (reviewing the decision of a bank-

ruptcy court). Plaintiffs also reference a 1943 California case involving tenants suing a landlord for damages resulting from a fire that occurred on rented premises for the following proposition of tort law relating to dangerous conditions on leased premises:

> [I]f there is some hidden defect in the premises, or danger thereon, which is known to the lessor at the time of making the lease, but which is not apparent to the intending lessee, the lessor is bound to inform the latter thereof, and failing so to do, he is liable for injuries to the tenant arising therefrom.

*Shotwell v. Bloom*, 60 Cal.App.2d 303, 310, 140 P.2d 728 (Cal.Ct.App.1943). Finally, Plaintiffs cite to a case in which the California Court of Appeal held that a landlord had committed actual fraud on his tenant when he leased an apartment to the tenant knowing that the apartment violated zoning laws. *See Barder v. McClung*, 93 Cal. App.2d 692, 697, 209 P.2d 808 (Cal.Ct.App. 1949).

Plaintiffs' argument appears to be as follows: Defendants defrauded Plaintiffs because Defendants knew that Plaintiffs would be required to obtain authorization for take under the ESA before removing their homes from the mobile home park and Defendants failed to disclose this fact to Plaintiffs. Neither of these contentions is borne out by the facts. First, it is not at all clear that Defendants knew that Plaintiffs would be required under the ESA to obtain ITPs before they could remove their homes. On the contrary, it appears that Defendants were and are of the belief that any actions undertaken by Plaintiffs

to remove their homes in conformity with the Conversion Project are covered by Defendants' ITPs. *See* Ex. R–154. That Defendants hold this belief in good faith is supported by the fact that the General Plan of 1982 explicitly contemplates the removal of the existing mobile home park, the Environmental Impact Report states that owners will relocate their own property, and the NCCP/HCP Implementation Agreement, effective July 17, 1996, specifically states that the General Plan of 1982 is compatible with environmental policies and requirements. Exs. N–109, O–119, 20–265.

 Plaintiffs offer no evidence that Defendants knew or even contemplated that Plaintiffs could be required to obtain separate ITPs. Plaintiffs offer no evidence that Defendants deliberately withheld or failed to disclose to Plaintiffs the environmental effects of the Conversion Project. Furthermore, it is clear that the residents of El Morro knew of potential environmental impacts at the very latest by January 23, 2001, when the manager of the El Morro Village attended a meeting during which the potential environmental aspects of the Conversion Project were discussed. Ex. 16–56, 59.[3]

At oral argument, Plaintiffs' counsel expanded upon the fraudulent misrepresentation claim described in Plaintiffs' papers, propounding an inflammatory conspiracy theory of deliberate circumvention of the ESA by the California Department of Parks and Recreation. Plaintiffs claim that Defendants deliberately failed to advise Plaintiffs to obtain their own ITPs

---

**3.** Defendants request that the Court take judicial notice of Exhibit 16, which is a memorandum entitled "Meeting Minutes # 1" that was part of the administrative record in the matter of *El Morro Community Association, et al. v. California Department of Parks and Recreation, et al.*, Case No. G0322990, California Court of Appeal, Fourth Appellate District,

Division Three. The Court may take judicial notice of facts that are "capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned." Fed.R.Evid. 201(b)(2). Because Exhibit 16 is part of an administrative record in a state court case, the Court takes judicial notice of it.

because Defendants wanted Plaintiffs to do the so-called dirty work for the state. As described by Plaintiffs at oral argument, the state's design was to have the Plaintiffs demolish their own homes and, in the course of doing so, kill or scare away any endangered species in the area. By letting the residents kill all the endangered species, the state could undertake its own construction efforts without obtaining requisite take authorization for the plover and without fear of incurring liability under the ESA. The state hatched this plan, Plaintiffs contend, because it knew it could never undertake the Conversion Project without taking the plover and it knew it could never obtain the requisite take authorization for the plover.

To be sure, this theory, if true, would be cause for great concern. Yet Plaintiffs presented this theory for the first time at oral argument without offering any evidence that such a fraudulent scheme ever existed. Notably, Plaintiffs' theory fails to account for the fact that the state has demonstrated an interest in both complying with federal law and protecting endangered species. The state has obtained the requisite take authorization for the gnatcatcher, pocket mouse, and vireo and the state has also incorporated into the Conversion Project a number of mitigation measures, which are designed to minimize impacts to the species in the area. *See* Ex. O–133–36. If Plaintiffs intended to proceed to trial with such extreme allegations of fraud, Plaintiffs would be held to the heightened pleading standard of Rule 9(b) and would ultimately be required to prove such a fraudulent scheme with evidence. *See* Fed.R.Civ.P. 9(b) (requiring that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity"). Reliance on a conspiracy theory not supported by any facts as the basis for their legal argument further diminishes Plaintiffs' likelihood of success on the merits.

In short, Plaintiffs offer no legal argument and no evidence suggesting that they have any chance of success on the merits of their claim that Defendants violated Plaintiffs' procedural due process rights by tortiously failing to disclose material facts known to Defendants.

### 2. Irreparable Harm

Plaintiffs assert that they currently face a dilemma and that without the requested preliminary injunction, they will suffer irreparable harm. The dilemma that Plaintiffs face is that, under their interpretation of the law, they must either lose valuable property by leaving their mobile homes where they are or they must imperil themselves by removing their mobile homes and facing the possibility of civil or criminal penalties for violating the ESA. On the other hand, Defendants assert that Plaintiffs will not be subject to civil or criminal liability for violation of the ESA because Plaintiffs, as tenants of the state, are covered by the state's ITP.

The state's ITP, which permits incidental take of the gnatcatcher, pocketmouse, and vireo, applies to conduct of the Plaintiffs contemplated by Plaintiffs' lease with the state and the NCCP/HCP Implementation Agreement. Under 50 C.F.R. § 13.25(d), "any person who is under the direct control of the permittee ... may carry out the activity authorized by the permit." 50 C.F.R. § 13.25(d). When a permit is issued to a state entity, a person is considered to be "under the direct control of the permittee" when "the person ... has executed a written instrument with the governmental entity, pursuant to the terms of the implementing agreement." 50 C.F.R. § 13.25(e). The state's NCCP/HCP Implementation Agreement states that "[s]o long as the Section 10(a)

Permit holder(s) are in compliance with the provisions of this Agreement, any contractor, or other third party under the direct control of the permit holder(s) ... shall be entitled to proceed with Take as authorized by this Agreement." Ex. 20–283–84.

■ Keeping these provisions in mind, the issue narrows to whether the tenants are sufficiently under the control of the state to be entitled to the protections of the state's permit. At oral argument, counsel for Plaintiffs argued that Plaintiffs could not possibly be construed to be under the control of Defendants because in removing their mobile homes from the land, Plaintiffs could simply dynamite their homes and Defendants would be powerless to stop them. But as counsel for the state noted, Plaintiffs' argument seems to overlook the fact that Plaintiffs are living on public land pursuant to a lease agreement with the state. But for the lease agreement with the state, Plaintiffs would not have been entitled to live on and exclusively enjoy public land. The lease agreement requires Plaintiffs to remove their own mobile homes at the termination of their lease, it requires Plaintiffs to comply with all municipal, state, and federal laws, and it requires Plaintiffs to obtain the written consent of the state prior to replacing or altering their mobile homes. Ex. 10–36, –37, –39. Thus, the lease agreement provides the level of control necessary for Plaintiffs to come within the protection of the state's ITP. Because Plaintiffs are covered by the state's ITP, there is no threat of irreparable injury due to possible civil or criminal liability for take of species covered by the ITP. Counsel for Plaintiffs noted at oral argument that if this Court denies the preliminary injunction, he will advise his clients to refrain from removing their homes because of the threat of possible civil or criminal liability. While Plaintiffs' counsel is free to exercise his independent professional judgment regarding his clients' possible liability, this Court is of the opinion that Plaintiffs are not likely to incur civil or criminal liability for take of the gnatcatcher, pocket mouse, or vireo as long as they comply with the terms of the state's ITP.

However, the take authorization obtained by the state and applicable to the Plaintiffs does not permit either the state or the Plaintiffs to take the plover. Notably, the threat of civil or criminal liability for take of the plover could only exist for those residents of the mobile home park who live in the units to the west of the Pacific Coast Highway along the beach. Because the plover is a shorebird that forages along the beach, there is no risk that those residents who live in the main part of the mobile home park, located to the east of the Pacific Coast Highway, will take the plover by removing their mobile homes and, thus, there is no risk that they will be sued or prosecuted for taking the plover.

With respect to the people responsible for removing the units along the beach, the question of whether they will suffer irreparable harm amounts to the question of whether they are likely to take the plover. Under the ESA, "take" is defined as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). "Harass" is further defined by regulation as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. Based on the submissions of the parties, it appears that removal or demolition of the units along the beach may result in some disruption of the plover's foraging behavior. *See* Suppl. Levine Decl. ¶¶ 2–3. Al-

though Plaintiffs' expert has observed plovers foraging along the beach, that does not necessarily mean that removal or demolition will significantly disrupt the plover's normal behavioral patterns. *See id.* Additionally, Moro Beach does not clearly serve as a wintering or nesting habitat for the plover. Exs. J–87, H–67.

### 3. Balance of Hardships and Public Interest

 While plaintiffs may suffer personal and financial hardship as a result of removing or demolishing their homes, it is not in the public interest to grant an injunction. The Court is sensitive to the upheaval associated with the removal and demolition of Plaintiffs' homes and the Court recognizes that some residents of El Morro Village may encounter some difficulty obtaining affordable housing, but Plaintiffs have had notice of the imminent eviction for at least five years, when their lease was renewed, and for as many as twenty-two years, when the General Plan was publicly formulated. Additionally, if the Court erroneously grants the preliminary injunction to the Plaintiffs, the state's project is postponed at least for one year. The Conversion Project is time-sensitive because the state's mitigation measures depend on breeding and wintering seasons of the species in the area. *See* Ex. H–66.

Moreover, while Plaintiffs' hardship is of a personal nature, Defendants' hardship is of a public nature. The Conversion Project is intended to follow through on a plan that is over two decades old to create public campgrounds at the site of El Morro Village. It is in the public's interest for the state to use state lands in a manner that provides benefits to the public at large, rather than in a manner that provides benefits to only a few.

### 4. Preliminary Injunction is Not Appropriate

Balancing the factors discussed above, it is clear that the Court cannot grant Plaintiffs a preliminary injunction. Plaintiffs have failed to demonstrate any likelihood of success on the merits. Because Plaintiffs must, at "an irreducible minimum," demonstrate "a fair chance of success on the merits" Plaintiffs application for preliminary injunction fails. *See Martin,* 740 F.2d at 675. Further, the balance of hardships does not tip decidedly in the Plaintiffs' favor and the public interest does not favor granting the injunction. Therefore, preliminary injunction based on Plaintiffs' procedural due process claim is not appropriate.

### B. Citizen Suit under the ESA, 16 U.S.C. § 1540(g)

The ESA contains a citizen suit provision, which permits "any person" to commence a civil suit on his own behalf "to enjoin any person, including the United States and any other governmental instrumentality or agency ... who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A). But no such action may be commenced unless the plaintiffs has provided at least sixty days written notice of the alleged violation to both the Secretary of the Interior and the alleged violator. 16 U.S.C. § 1540(g)(2)(A)(i).

### 1. The Court Lacks Jurisdiction Over Plaintiffs' Claims of Harm to the Plover

 Plaintiffs' citizen suit with respect to the alleged take of the plover is improper because Plaintiffs failed to provide the requisite sixty-day notice that they intended to sue Defendants for taking the plover. The sixty-day notice require-

ment is jurisdictional and a failure to comply strictly with the notice requirement acts as an absolute bar to bringing suit under the ESA. *Southwest Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,* 143 F.3d 515, 520 (9th Cir.1998) (citing *Save the Yaak Comm. v. Block,* 840 F.2d 714, 721 (9th Cir.1988)). The purpose of the sixty-day notice requirement is "to put the agencies on notice of a perceived violation of the statute and an intent to sue. When given notice, the agencies have an opportunity to review their actions and take corrective measures if warranted. The provision therefore provides an opportunity for settlement or other resolution of a dispute without litigation." *Id.* (quoting *Forest Conservation Council v. Espy,* 835 F.Supp. 1202, 1210 (D.Id.1993), *aff'd,* 42 F.3d 1399, 1994 WL 666077 (9th Cir.1994)). The Ninth Circuit has held that where a plaintiff's notice letter fails to provide specific notice of its intention to sue based on harm to that particular species, notice is inadequate. *Id.* at 522. However, if the "letter as a whole provide[s] notice sufficient to afford the opportunity to rectify the asserted ESA violations," then that notice is "sufficient to satisfy the jurisdictional requirement of notice under 16 U.S.C. § 1540(g)(2)(A)(i)." *Marled Murrelet v. Babbit,* 83 F.3d 1068, 1073 (9th Cir.1996).

Although Plaintiffs sent a letter titled "Sixty–Day Notice of Intent to Sue for Violations of the Federal Endangered Species Act: Demolition of El Morro Mobile Home Park" to Defendants, the Secretary of the Interior, and the Director of the FWS, the letter does not mention the plover as one of the species at risk. Ex. L. The letter specifically mentions the gnatcatcher, the pocket mouse, and the least Bell's vireo as the federally-protected species at issue, and it also lists a number of sensitive plant species in a footnote, but it does not mention the plover. Ex. L–93.

At oral argument, counsel for Plaintiffs urged the Court to reach the merits of the claim regarding take of the plover because, as stated by Plaintiffs' counsel, the plover is the heart of the matter. Counsel referenced an Eleventh Circuit case, *Loggerhead Turtle v. County Council,* 148 F.3d 1231 (11th Cir.1998), and argued that the Court should reach the merits of the plover claim notwithstanding the conceded fact that the sixty-day notice of intent to sue failed to mention the plover. In *Loggerhead,* the Eleventh Circuit determined that the District Court should have permitted the plaintiff to amend the complaint to add a party, the leatherback sea turtle. *Loggerhead Turtle,* 148 F.3d at 1258. Although Federal Rules of Civil Procedure 15(a) or 21 provided the governing standard given the posture of the case, the substance of the plaintiffs' request for leave to amend was to allege additional takes of the leatherback sea turtle, a species not previously named in the suit. *Id.* at 1255. The Eleventh Circuit found that the sixty-day letter gave adequate notice to the Secretary of the Interior and defendants for several reasons. First, the letter expressed the need for "immediate action ... to eliminate ... artificial beachfront lighting sources that take *protected sea turtles* during turtle nesting season." *Id.* Additionally, the letter explicitly referenced the species sought to be added as one of the three species of sea turtles that nested on the beach at issue in that case. *Id.* The letter went on to state that the plaintiffs "possessed evidence of '*at least* 33 independent violations of the ESA.'" *Id.* Thus, the Eleventh Circuit found that "although the leatherback sea turtle 'was referenced in only one part of the letter, the letter as a whole provided notice sufficient to afford the opportunity to rectify the asserted ESA violations.'" *Id.* at 1256 (citing *Marbled Murrelet,* 83 F.3d at 1073).

The distinguishing feature of this case, however, is that the sixty-day notice letter never once mentions the plover and, therefore, never provided the state the opportunity to rectify the asserted ESA violation with respect to the plover. *See* Ex. L; *see also Marbled Murrelet*, 83 F.3d at 1073. The three species of animal that are explicitly named in the letter are the gnatcatcher, the vireo, and the pocketmouse. *See* Ex. L–93, 95. It is particularly significant that those are the three species named in the letter because those three species were also specifically named in the ITP that the California Department of Parks and Recreation had already obtained. *See* Ex. 24–357. In other words, the sixty-day notice letter provided notice to the state that Plaintiffs intended to sue to enjoin the state from taking species for which the state already had take authorization. Additionally, by naming the other three species the letter did not give Defendants notice of the possible violations with respect to the plover because the location of the plover is different from the locations of the other species. According to Plaintiffs' expert, the plover is a shorebird that forages along the sandy beaches of Crystal Cove. Suppl. Levine Decl., ¶ 2. By contrast, Plaintiffs' Exhibit 25 indicates that the other three species occur largely on the inland side of the Pacific Coast Highway. Ex. 25. The only other species that appears to have been sighted on the western side of the Pacific Coast Highway is the gnatcatcher. *See* Ex. 25. As indicated on the map, it appears that the gnatcatcher is located only in areas of vegetation at least 750 feet away from where Plaintiffs' expert saw the plovers. The difference between the location of the plover and the locations of the other three species indicates that naming the other three species in the letter of intent to sue in no way put Defendants on notice that the plover was at issue. Thus, because the letter never once mentions the plover, because the let-

ter only mentions three species for which Defendants already had take authorization, and because the location of those species mentioned differs significantly from the location of the plover, the letter failed to provide adequate notice to the state of the possible claim relating to the plover.

Had the letter specifically mentioned the plover even once, it is possible that the state could have addressed Plaintiffs' concerns about the plover amicably and without the present lawsuit. However, as Plaintiffs' counsel conceded at oral argument, Plaintiffs' real concern is not the plover or any other federally protected species. Rather, Plaintiffs' real concern is themselves. Accordingly, it is not surprising that Plaintiffs did not give the state an opportunity to avoid litigation regarding the plover because litigation over the plover is the vehicle by which Plaintiffs can protect themselves. Yet Plaintiffs' possible motive for failing to give proper notice of their claim relating to the plover is immaterial to the issue of whether this Court has jurisdiction. Plaintiffs' letter of intent to sue failed to give Defendants the opportunity to review the effect their actions could have on the plover prior to engaging in litigation. The failure to comply strictly with the notice requirement acts as an absolute jurisdictional bar to bringing suit under the ESA. *Southwest Ctr. for Biological Diversity*, 143 F.3d at 520. Thus, this Court lacks jurisdiction over Plaintiffs' claims as they pertain to the plover.

**2. Other Species**

█ Plaintiffs have provided proper notice of their intention to sue with respect to the gnatcatcher, the pocket mouse, and the vireo. The test for obtaining a preliminary injunction under the ESA is different from the traditional test. "Congress has determined that under the ESA the bal-

ance of hardships always tips sharply in favor of endangered or threatened species." *Marbled Murrelet,* 83 F.3d at 1073. Therefore, Plaintiffs are entitled to a preliminary injunction under the ESA if they can demonstrate "sufficiently serious questions going to the merits to make them a fair ground for litigation." *Id.* In order to prevail, "[t]he plaintiff must make a showing that a violation of the ESA is at least likely in the future." *Nat'l Wildlife Fed'n v. Burlington Northern R.R., Inc.,* 23 F.3d 1508, 1511 (9th Cir.1994).

Here, the substance of Plaintiffs' claim under the ESA is that the Conversion Project is going to result in the taking of the gnatcatcher, the pocket mouse, the vireo, and the plover. As Plaintiffs concede, Defendants have adequate take authorization for the gnatcatcher and the pocket mouse. App. for Preliminary Injunction, p. 20. Defendants also have conditional take authorization for the vireo. Because the Court cannot consider whether the Conversion Project will result in a take of the plover, the only remaining question is whether "sufficiently serious questions" exist regarding whether Defendants' conditional permit for incidental take of the vireo adequately authorizes Defendants to proceed with the Conversion Project. *See Marbled Murrelet.* 83 F.3d at 1073.

As discussed above in the Background section, Defendants have obtained conditional authorization for take of the vireo. In order for incidental take of the vireo to be covered by Defendants' ITP, the vireo habitat in question must not have "potentially significant long-term conservation value in the subregion." Ex. 20–238. Additionally, the Participating Landowner must conduct surveys for the vireo and the Participating Landowner's activities must be consistent with a mitigation plan that:
1) addresses design modifications and other on-site measures that are consis-

tent with the project's purposes, minimizes impacts, and provides appropriate feasible protections, 2) provides for compensatory habitat restoration/enhancement activities ..., and 3) provides for monitoring and Adaptive ·Management of habitat consistent with ... the NCCP/HCP. The mitigation plan will be developed in coordination with ... and approval by [the] USFWS.
Ex. 20–238.

◼ With respect to the first issue, no serious question for litigation exists as to whether the vireo habitat in the immediate. vicinity of the mobile home park has significant long-term conservation value. According to the declaration of Karen Miner, a Senior State Park Resource Ecologist for the· California Department of Parks and Recreation, she conducted surveys of the vireo according to the survey protocol approved by the FWS along the lower portions of Moro Creek, ·including the stretch of creek that runs through the mobile home park on May 1, May 17, and June 12, 2001 and she reported the results to FWS. She states that no vireos were detected in the Moro Creek canyon during her surveys. Miner Decl., ¶ 15. Ms. Miner states that during her 2001 surveys, she located "one breeding pair" of vireos in the bottom of Muddy Canyon, which is adjacent to the Pacific Coast Highway and approximately 800 feet away from the mobile home park. *Id.,* ¶ 16. She notes that during the following year, that pair produced four young vireos notwithstanding the grading that was occurring for adjacent development along the north side of the canyon, approximately 250 feet away from the vireo territory. *Id.*

Plaintiffs submitted a declaration of David Levine, the principal biologist for and owner of Natural Resource Consultants (NRC), in support of their application for preliminary injunction. Mr.

Levine's account of the area does not substantially differ from that of Ms. Miner, despite the fact that he reaches the opposite ultimate conclusion. With respect to the Moro Creek area, Mr. Levine states: "Based on objective criteria and habitat location, the likelihood of this area to support vireo was determined to be 'medium' according to standards created and deployed under Bio-View Habitat Suitability Indexes and the California Wildlife Habitat Relations Data." Levine Decl., ¶ 22. Although Mr. Levine does not explain exactly what "medium" means, his declaration focuses on the vireo habitat in Muddy Creek, located approximately 750 feet away from Moro Creek. *Id.*, ¶ 23. Mr. Levine notes that since 2001, the Newport Coast has been developed for residential and commercial purposes within 500 feet of Muddy Canyon. *Id.*, ¶ 20. Additionally, Mr. Levine states that drainage facilities associated with parking areas have been constructed adjacent to the willow scrub in Muddy Creek. *Id.* Mr. Levine opines that these changes to the area could reduce the quality of the vireo habitat in Muddy Creek and increase the likelihood of vireo nesting in or otherwise using Moro Creek. *Id.*, ¶ 23. Mr. Levine offers no empirical support for this possibility. Thus, these suppositions about the possibility of a vireo habitat existing at Moro Creek do not constitute "fair ground for litigation." *See Marbled Murrelet.* 83 F.3d at 1073.

Additionally, Defendants have a mitigation plan for the Conversion Project, which appears to meet Defendants' obligations under the NCCP/HCP Implementation Agreement and which Defendants have submitted to the FWS for approval. Ex. G. Defendants appear to have taken into consideration the possibility that vireos could move into Moro Creek at any time prior to implementation of the Conversion Project and have proposed a number of mitigation measures. Ex. H–66. The mitigation measures include limiting construction to the non-breeding season to the extent practicable, arranging for weekly surveys by a qualified biologist to detect and protect native birds in habitat within 300 feet of the work area, and, if the surveys show that the project activities are disrupting nesting behavior, rescheduling or modifying the activities to avoid significant impacts. *Id.* In light of the proposed mitigation measures, it does not appear that serious questions exist as to whether Defendants will exceed the authority granted by their conditional ITP.

## III. DISPOSITION

For the foregoing reasons, the Court DENIES Plaintiffs' application for preliminary injunction.

IT IS SO ORDERED.